# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>STEVEN G. ROSSER,<br><br>Defendant. | CASE NO. 2:20-CR-062(1)<br><br>JUDGE SARAH D. MORRISON |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

The United States hereby responds in opposition to Defendant Steven G. Rosser's motion for a judgment of acquittal on Count 2 (ECF No. 94). As explained below, Rosser has failed to meet his "very heavy burden" of demonstrating that "after viewing the evidence in the light most favorable to the prosecution, *no* reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 813 F.3d 251, 255 (6th Cir. 2016) (emphasis added) (cleaned up). As a result, the Court should **DENY** his motion for a judgment of acquittal.

### I. BACKGROUND

In 2020, the Grand Jury returned a three-count Indictment against former Columbus Police Vice Detectives Steven Rosser and Whitney Lancaster. (Indictment, ECF No. 5). Count 1 charged Rosser with civil rights conspiracy, in violation of 18 U.S.C. § 241, with respect to the false arrest and search of Brandon Adams. Count 2 charged both defendants with civil rights conspiracy with respect to the false arrest and search of Armen Stepanian and his vehicle.[1]

---

[1] Prior to trial, the Court dismissed Count 3, which had charged both defendants with wire fraud conspiracy, upon a motion from the Government. (Order, ECF No. 73).

The case was tried to a jury beginning on February 14, 2022. Over the course of five days, the Government presented testimony from twenty-three witnesses, admitted over two-dozen exhibits, and offered a series of stipulations between the parties. At the conclusion of the Government's case, both defendants moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a), alleging insufficient evidence to support any convictions. The Court heard oral argument from the parties but reserved ruling on the motions until after the jury returned its verdicts, consistent with Rule 29(b). After a day-and-a-half of deliberations, the jury returned a guilty verdict against Rosser on Count 2. The jury, however, found Rosser *not* guilty on Count 1 and found Lancaster *not* guilty on Count 2. In other words, the jury carefully followed this Court's instructions with respect to evaluating the evidence differently with respect to each defendant and with respect to each charge.

## II.  LEGAL STANDARDS

When reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This inquiry does not permit a reviewing court "to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id.* at 318-19 (quotation omitted). A reviewing court is not permitted to re-weigh the evidence or to substitute its judgment for that of the jury; instead, the court is "bound to make all reasonable inferences and credibility choices in support of the verdict." *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008). This well-known standard "gives full play to the responsibility of the [jury] to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

With respect to the conviction at issue here, "the existence of a § 241 conspiracy need not be proved by direct evidence, and a common plan may be inferred from circumstantial evidence." *Robinson*, 813 F.3d at 256 (cleaned up). That is, "a tacit understanding is enough to show a conspiratorial agreement," and "once a conspiracy has been established, only slight evidence is necessary to implicate a defendant." *Id.* (quotation omitted). The evidence, moreover "need not remove every reasonable hypothesis except that of guilt." *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993) (quotation omitted). In the face of these standards, convicted defendants like Steven Rosser face a "very heavy burden" in seeking to overturn the jury's verdict based on the sufficiency of the evidence. *Robinson*, 813 F.3d at 255 (quotation omitted).

### III.  ANALYSIS

The Court should deny Rosser's motion for a judgment of acquittal because he has failed to meet his "very heavy burden" of showing that <u>no</u> rational jury could have found him guilty. When *all* the evidence is considered, and when that evidence is viewed in the light most favorable to the Government, the jury's careful and considered guilty verdict on Count 2 should stand.

<u>Trouble at the Dollhouse</u>.  In 2017 and 2018, ownership of the Dollhouse strip club was in limbo. Yelena Nercessian owned part of the club, as did her husband at the time, Armen Stepanian. Further complicating matters, Nercessian had hired Nick Jgenti to replace Stepanian as manager, which created more stress between her, Jgenti, and Stepanian—both personally and professionally. Stepanian testified that he had concerns about management of the Dollhouse and was having difficulty getting Jgenti to provide answers about the club's financial condition. In October 2017, Stepanian filed a lawsuit against Nercessian regarding his financial interests in the club. After filing that suit, Stepanian still stopped by the Dollhouse, often around closing time, to check up on the business and to check up on Nick Jgenti.

Yelena Nercessian testified that the relationship between Stepanian and Jgenti was getting worse, and that they were not getting along. Nercessian also testified that she talked to Jgenti about what they would have to do to get Stepanian out of the club. Though Nercessian testified that she meant using her lawyers to get rid of Stepanian, the evidence at trial established that Jgenti favored another plan—the conspiracy at issue in Count 2.

*An Illegal Solution*. Allison Mills was the longtime girlfriend of Nick Jgenti. She also worked as a bartender at the Dollhouse. To say the least, the relationship between Mills and Jgenti was volatile, but it also lasted for almost seven years, which included the relevant 2018 timeframe. As Mills made clear during her testimony, Jgenti and his longtime friend—then-Detective Steven Rosser—formed an illegal plot to take care of the trouble at the Dollhouse.

Mills testified about first meeting Steven Rosser years prior when she was still living with Jgenti above the Patio bar. Mills later learned Rosser was a police officer, though he "didn't act like one." She observed Rosser at Nick's Cabaret (a different strip club that Jgenti managed) a handful of times—primarily hanging out at the bar or in Nick Jgenti's private office. According to Mills (and others), Rosser did not pay for his drinks, he never issued any citations to any staff or patrons at Nick's Cabaret, and it was never clear if he was on duty or off duty when seen there. Mills also observed Rosser in Jgenti's private office after closing time—drinking and sitting with Jgenti with money out on the table. Mills also knew Jgenti was using cocaine at this time, and she even saw Jgenti do cocaine in his office once while Rosser was present.

By 2018, Jgenti had moved on to managing the Dollhouse. He complained to Allison Mills that Stepanian was trying to take away the Dollhouse. Mills testified that Jgenti told her that Jgenti needed to "get him (Stepanian) set up" or "caught with possession of cocaine" and that he would "use Steve Rosser" to help to force Stepanian out of the club.

4

*The Conspiracy in Motion*.  Although Mills was not aware of every detail of the plot to set Stepanian up for possession of cocaine, she later learned that it went into effect beginning on April 19, 2018—the same day as the funeral for the brother of Rosser's partner on the Vice Squad, Whitney Lancaster.[2]  Mills testified that on that day, Jgenti went to Todd Lancaster's funeral but made her tend bar at the Dollhouse.  After the funeral, Jgenti returned to the Dollhouse with Rosser and Whitney Lancaster.  Mills testified that Rosser, Lancaster, and Jgenti retreated into Jgenti's office at the Dollhouse and shut the door.  Mills was not sure when Rosser and Lancaster left.

Mills testified that later that night—moving into the early hours of April 20th—Jgenti gave her a baggie of cocaine to share with Stepanian in Jgenti's office.  Stepanian also testified that Jgenti had supplied the cocaine.  Mills, who admitted previously using cocaine during this same timeframe, explained that she was surprised as she was not normally allowed in Jgenti's office.  Mills also described the baggie of cocaine as being a "good amount" and a quantity that would normally take her "days" to use.  Stepanian had come into the Dollhouse around closing time that morning and Jgenti told Mills to do the cocaine with Stepanian.  At some point, Mills cut up several lines of cocaine and ingested them with Stepanian.  Jgenti then ran out of the office to use the bathroom.  Mills and Stepanian both testified that Jgenti's abrupt departure seemed strange.

Mills then observed a police presence outside the club on the security camera monitors inside of Jgenti's office.  And another staff member knocked on the door and alerted her that the police had arrived.  At first, Mills was unsure if this was the "set up" that Jgenti had previously described to her, so she grabbed the baggie of cocaine and hid it in her Lululemon pants before exiting the office.  As she was leaving the office, she saw Steven Rosser approaching.  Rosser smiled and winked at her before asking where Armen was located.

---

[2] FBI Special Agent Vic Ciapas testified that Todd Lancaster's funeral was held on April 19, 2018.

5

Dollhouse employee Michael Goebel confirmed in his testimony that Nick Jgenti was in the bathroom at the time CPD officers entered the club. More importantly, Goebel's testimony placed Allison Mills coming out of Nick Jgenti's office just as law enforcement officers entered the club. In addition to corroborating Mills's explanation of the sequence of events, Goebel's testimony is consistent with the explanation of Armen Stepanian himself, who testified that he was attempting to follow Mills out of the office when he was confronted by the police.

Mills saw Rosser go into the office and, a short time later, she saw Armen Stepanian in handcuffs being taken out of the Dollhouse. Stepanian and other patrol officers present that night testified that he was arrested, searched, and taken to a paddy wagon stationed outside. Stepanian also testified that officers searched his vehicle, which was parked in the Dollhouse lot, without his consent. CPD Patrol Officer Howard Robbins (then a trainee) testified that he searched Stepanian's vehicle at Rosser's direction. Stepanian was then placed in Rosser's personal vehicle, questioned by Rosser, and later taken downtown to CPD Headquarters for booking.

*The Coverup*. After arresting Stepanian for possession of cocaine, Rosser prepared and submitted an arrest report that attempted to cover up his justification for being at the Dollhouse, the circumstances of Stepanian's arrest, and any follow on "investigation" that he conducted

Vice Lieutenant Ronald Kemmerling testified about the operations of the Vice Unit, the need for accurate report writing, and the policies governing the use of confidential informants. According to Lt. Kemmerling's testimony (and common sense), officers submitting arrest reports need to accurately describe events, as other officers, supervisors, prosecutors, and other actors in the criminal justice system rely on those reports to determine the facts supporting an arrest. The arrest report (or U-10.100) that Rosser wrote and submitted regarding Stepanian's arrest was admitted into evidence as Government Exhibit 207.

That arrest report was prepared by Rosser as the arresting officer and included a "Statement of Fact" which is defined by the document itself as containing: "In chronological order what happened, the elements of the offense(s). What probable cause existed, and what each witness in Block 91 can testify to." (Govt. Ex. 207, P.2). Significantly, Rosser is the only person listed in Block 91 as a witness to be subpoenaed at trial to support the facts that followed. Exhibit 207 is the only documented evidence with any version of events explaining Rosser's presence at the Dollhouse that night or the circumstances of Stepanian's arrest. As the testimony in this trial revealed, Rosser's version of events was contradicted by every witness who was present that night.

As for Rosser's justification for being at the Dollhouse, the arrest report states that "on April 19, 2018, around 12:00pm Det Rosser #77 was advised by a concerned citizen that the employees of Dollhouse located at 1680 Karl Ct were allowing patrons to stay after 2:30am and continue consuming alcohol on a regular basis." (*Id.*). The report further states that "On April 20, 2018, at 4:30am Det Rosser observed numerous vehicles still in the parking lot of the Dollhouse. Det Rosser contacted patrol and requested the assistance of a uniformed officer while Det Rosser conducted an investigation into the after hour activity." (*Id.*). In stark contrast, CPD patrol officers Ramsier, Robbins, and Thatcher all testified that Rosser called them to the Dollhouse around 3:00am (not 4:30am) to assist in a planned *drug arrest* (not with after-hours liquor violations). These blatant contradictions have never been justified. This fraudulent report buttresses Allison Mills's testimony that the set up to arrest Stepanian included Steven Rosser; otherwise, why take such creative license with such an important report? Any CPD supervisor, prosecuting attorney, defense attorney, or judge reviewing Stepanian's arrest would be given this report, which was littered with falsehoods and made no mention of any other witnesses to the events, including the names of any of the involved CPD patrol officers or staff present at the Dollhouse.

7

As for the arrest itself, Aremn Stepanian's testimony combined with the testimony of the patrol officers again contradicts Rosser's version of events. Rosser claimed that Stepanian was facing the desk in the office "bent over top of it" before Rosser discovered "the pile of suspected cocaine." (*Id.*). But Stepanian testified that he was trying to leave the office (following Mills) when officers arrived. Likewise, Stepanian and the patrol officers testified that Rosser struggled to find any cocaine, including having to be told to look under a takeout food box before finding a miniscule amount of cocaine residue weighing 0.017 grams, or less than two hundredths of a gram—hardly a "pile" of suspected cocaine.

As for any follow-on "investigation," Rosser's report first states he "reentered the bar and interviewed all the employees one by one separately in the office regarding their knowledge of the seized suspected cocaine." (*Id.*). But the CPD patrol officers denied this and testified that there were no interviews conducted. In fact, Rosser first told them to not even bother collecting names or contact information for the staff members present. Mike Goebel also testified that there were no interviews conducted of any of those present when Stepanian was arrested. Rosser's report goes on to state that he interviewed Allison Mills in Jgenti's office. According to Mills, Rosser never asked her about Stepanian or any cocaine, the remainder of which was still in her pocket. Instead, Rosser asked Mills why she was still with Jgenti and talked casually of their relationship. When asked about quotes attributed to her in the arrest report that Rosser authored, Mills denied that any such questioning took place. In fact, Mills specifically denied being asked "if she had any knowledge of Mr. Stepanian possessing cocaine," as Rosser stated in the arrest report. Mills also denied telling Rosser that Stepanian asked if she wanted to "do a line" with him and that she never told Rosser that she does not use cocaine. Mills made clear in her testimony that these statements were simply not true and that Rosser had never questioned her about them.

Rosser's report also curiously omits any mention of a search of Armen Stepanian's vehicle—which was done at Rosser's direction but without Stepanian's consent.  That search, of course, uncovered no illegal narcotics or other contraband.

Any suggestion that this arrest report was falsified, in part, to protect the identify of a confidential source is directly contradicted by the evidence at trial.  Lt. Kemmerling testified that Government Exhibits 401 and 402 were the written policies governing the CPD Vice Unit.  Section 4 of those policies addresses the use of confidential informants and specifically states: "A confidential source may be identified by name in an investigative report.  If there is just cause to preserve anonymity and the circumstances do not warrant classification as an informant, the term 'confidential source' may be used."  (Govt. Ex. 401, P.20).  Nowhere is there justification for creative report writing or falsifying the timing, circumstances, and facts underlying an arrest.  Put simply, if Rosser wanted to protect a confidential source, he should have used the term "confidential source" in his report rather than falsifying nearly every aspect of Stepanian's arrest.

*Consciousness of Guilt*.  Whitney Lancaster was indicted for the same conspiracy alongside Rosser.  Following his indictment, but before he was provided with a cell-site location report prepared by FBI Special Agent Kevin Horan, Lancaster testified in a civil deposition that he was neither present at the time of Stepanian's arrest nor was he involved in any investigation of the Dollhouse. (Govt. Ex. 513.1, PP.80-81).  Contrary to that testimony, Special Agent Horan testified that Lancaster's cell phone was present at the Dollhouse from midnight until almost 5:30am on the morning of Stepanian's arrest.  Even more importantly, Lancaster's cell phone was in regular contact with Rosser's phone during that timeframe, including nine phone calls of various lengths between midnight and 5:33am, with three calls occurring between 4:40am and 4:46am, just as Rosser was about to make entry into the Dollhouse.  (*See* Govt. Ex. 306, P.12).

Special Agent Horan's testimony and report corroborate Allison Mills's testimony about seeing Lancaster together with Rosser and Jgenti at the Dollhouse the night of Todd Lancaster's funeral, and to seeing Whitney Lancaster circling around in the parking lot later that evening/early the next morning. In the face of this testimony and evidence, the jury was free to conclude that even Whitney Lancaster knew that his mere presence or involvement with whatever Steven Rosser and Nick Jgenti had cooked up would be damaging to his own case, hence his outright denials during his civil deposition. And while the jury ultimately acquitted Lancaster on Count 2, they were certainly free to consider his self-serving denials when evaluating the evidence against his co-defendant, whom they ultimately convicted.

*The Aftermath*. Having hatched a plot with his longtime friend, Nick Jgenti, to "set up" and arrest Armen Stepanian for possession of cocaine, Rosser was left with an underwhelming arrest for the possession of a mere 0.017 grams of cocaine residue. Allison Mills explained Rosser's reaction, when she testified that Jgenti later told her that Rosser was upset and had asked what happened to the larger bag of cocaine that was supposed to be in the office with Stepanian. Clearly, Rosser had expected to find more cocaine planted with Stepanian than the limited residue that Rosser struggled to find under the food box. And, contrary to defense counsel's suggestion, the testimony of Special Agent Horan, combined with his report, did, in fact, establish that Rosser's personal cell phone had twice called Nick Jgenti mere hours after Stepanian's arrest—once at 3:41pm and again at 3:58pm on April 20, 2018. (*See* Govt. Ex. 306, P.12). Cocaine residue be damned, the plot worked. As Armen Stepanian testified—he settled his civil lawsuit against Yelena Nercessian a few months after he was arrested. Under their arrangement, Stepanian gave up his ownership interest in the Dollhouse and left town to run a different strip club in Dayton. Nercessian and Jgenti, however, continued to own/manage the Dollhouse without him.

Fortunately, however, as Special Agent Ciapas testified, no prosecutor in *any* court of law decided to file any criminal charges against Armen Stepanian stemming from this set up and false arrest.

* * * * *

Those are the facts of this case, taken from the evidence—both direct and circumstantial—adduced at trial. When viewed most favorably to the Government, as this Court must, those facts support a rational jury (indeed, this very jury), in finding the defendant, Steven Rosser, guilty of conspiring with Nick Jgenti and others to violate the civil rights of Armen Stepanian.

## IV.  CONCLUSION

For these reasons, the Court should **DENY** Rosser's motion for a judgment of acquittal on Count 2 (ECF No. 94).

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

s/Noah R. Litton
KEVIN W. KELLEY (0042406)
NOAH R. LITTON (OH 0090479)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Phone:  (614) 469-5715
E-mails:   Kevin.Kelley@usdoj.gov
           Noah.Litton@usdoj.gov

## **CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing Response in Opposition was served this 23rd day of March, 2022, electronically upon all counsel of record.

                                                              s/Noah R. Litton
                                                               NOAH R. LITTON
                                                               Assistant United States Attorney