# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                      Case No. 2:20-cr-62
                                            JUDGE SARAH D. MORRISON

STEVEN G. ROSSER and
WHITNEY R. LANCASTER,

      Defendants.

## OPINION AND ORDER

Count II of the Indictment charged Defendants Steven Rosser and Whitney Lancaster with conspiring to "injure, oppress, threaten, and intimidate" Armen Stepanian in his right to be free from unreasonable search and seizure without probable cause under 18 U.S.C. § 241. (ECF No. 6.) For convictions on that count, the Government had to prove beyond a reasonable doubt that: (1) Defendants knowingly and voluntarily conspired with one or more persons to injure, oppress, threaten, or intimidate Mr. Stepanian; (2) in doing so, Defendants specifically intended to interfere with Mr. Stepanian's exercise or enjoyment of his right to be free from unreasonable searches and seizures; and (3) Defendants acted under color of law.

The jury found the Government sustained its burden as to Mr. Rosser via a February 25, 2022 guilty verdict.[1] (ECF No. 92.) Disagreeing with that

---

[1] The jury found Mr. Lancaster not guilty on Count II.

determination, Mr. Rosser now renews his motion for acquittal under Fed. R. Crim. P. 29, arguing that the Government's evidence was not substantial and competent enough to sustain a guilty finding. (ECF No. 94.)

## I. STANDARD OF REVIEW

Rule 29 allows the Court to enter a judgment of acquittal if the evidence presented at trial was "insufficient to sustain a conviction." When reviewing a Rule 29 motion, the Court decides "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In so considering, the Court cannot "weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury," *United States v. Ferguson*, 23 F.3d 135, 140 (6th Cir. 1994) (citation omitted), and must draw all inferences in favor of the Government, *United States v. Driver*, 535 F.3d 424, 428-29 (6th Cir. 2008) (citation omitted). Thus, defendants motioning under Rule 29 maintain a "very heavy burden." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (citation omitted).

## II. SUMMARY OF RELEVANT TESTIMONY & EVIDENCE

Evidence adduced at trial established the following:

Mr. Rosser and Mr. Lancaster worked together in the Vice Unit of the Columbus Police Department. Mr. Rosser worked as a liquor compliance officer and Mr. Lancaster was the nuisance abatement officer within the unit.

2

An associate of Mr. Rosser's named Nick Jgenti had co-owned a bar called The Patio with his girlfriend Allison Mills and had also managed and/or owned several strip clubs in Columbus. (Feb. 17, 2022 Tr.[2] at 159, 161, 164.) Ms. Mills met Mr. Rosser when he visited one of the strip clubs managed by Mr. Jgenti and she would talk to him when he visited The Patio. *Id.* at 164. Ms. Mills's testimony formed much of the basis for Mr. Rosser's conviction; Mr. Jgenti did not testify.

In 2015, Mr. Rosser frequently visited Nick's Cabaret, a strip club owned by Mr. Jgenti and where Ms. Mills worked as a bartender. Mr. Rosser never paid for his drinks there. *Id.* And Nick's frequently stayed open past its official closing time—Ms. Mills often saw Mr. Rosser "drinking, hanging out" at Nick's after closing even though there were a lot of drugs and "full-on" nude dances occurring at the club after-hours. *Id.* at 169-70. Other witnesses saw Mr. Rosser and Mr. Jgenti interacting on numerous occasions, often inside Mr. Jgenti's office at the club. Adrian Richardson even saw Mr. Jgenti and Mr. Rosser do drugs together. Mr. Jgenti used cocaine "a lot." *Id.* at 168. Mr. Rosser did not issue any citations for the illegal activities at Nick's. *See id.* at 168-69.

The charges in Count II relate to an ownership dispute in 2018 over another strip club known as the Dollhouse. The two owners of the Dollhouse were Yelena Nersesian and Mr. Stepanian; when they divorced in 2017, each retained ownership interest in the club. *Id.* at 3-4.

---

[2] All citations to transcripts of the trial are to the "rough" transcripts prepared for the Court's use in rendering this Opinion and Order.

3

Mr. Stepanian managed the club, but Ms. Nersesian was unhappy with his performance and sought to remove him as manager and obtain his ownership interest. *Id*. at 5. Litigation ensued. *Id*. Ms. Nersesian then hired Mr. Jgenti, a long-time family friend, to replace Mr. Stepanian as manager of the Dollhouse. *Id*. at 5. This upset Mr. Stepanian because, among other reasons, Mr. Stepanian and Mr. Jgenti did not get along. *Id*. at 7. Not surprisingly under the circumstances, Mr. Jgenti sided with Ms. Nersesian in the ownership dispute and they discussed legal ways to get Mr. Stepanian's ownership interest. *Id*. at 8-9.

Ms. Mills had followed Mr. Jgenti to the Dollhouse and often worked as a bartender there. It was there that she met Mr. Lancaster. *Id*. at 171, 72. She often saw Mr. Lancaster and Mr. Rosser drinking together at the Dollhouse "acting like they weren't even cops." *Id*. at 172-73. Like at Nick's, she regularly saw Mr. Rosser at the Dollhouse after closing time. *Id*. at 174. Ms. Mills did not see Mr. Rosser or Mr. Lancaster cite the Dollhouse for liquor or other violations. *Id*. at 174-75.

Ms. Mills testified extensively about the Dollhouse ownership dispute. Mr. Jgenti "made it seem like [Mr. Stepanian] was this bad guy." *Id*. at 176. Ms. Mills was present when Mr. Jgenti and Ms. Nersesian discussed "killing" Mr. Stepanian, though she "just thought it was a figure of speech" that she did not take seriously. *Id*. at 203. Another time, Mr. Jgenti told Ms. Mills that Mr. Rosser was going to help "have [Mr. Stepanian] set up and get arrested with being caught with cocaine"

4

so Mr. Stepanian would have to give up his ownership interest in the Dollhouse.[3] *Id*. at 177.

On April 19, Mr. Rosser and Mr. Jgenti went to Mr. Lancaster's brother's funeral. *Id*. at 177. Ms. Mills was bartending at Dollhouse that day. *Id*. at 178. After the funeral, the three men entered the club and went into Mr. Jgenti's office together and met behind closed doors for some time. *Id*. at 177-181.

Later that evening, Mr. Jgenti called Mr. Stepanian and asked him to come to the Dollhouse. Mr. Stepanian arrived near closing time. *Id*. at 179. Shortly before his arrival, Mr. Jgenti gave Ms. Mills a large bag of cocaine and told her to use it with Mr. Stepanian in Mr. Jgenti's office. *Id*. at 179 and 207. Mr. Jgenti's request made Ms. Mills uncomfortable because he had never allowed her in his office without him before, but she agreed to follow his instructions. *Id*. at 179, 187, 207.

When Mr. Stepanian arrived, Mr. Jgenti went to the bathroom. *Id*. As instructed, Ms. Mills and Mr. Stepanian went to Mr. Jgenti's office to do the cocaine. *Id*. at 179-80. Then, another Dollhouse employee "pounded" on the door to Mr. Jgenti's office and said someone was at the club's front door. *Id*. at 180. Ms. Mills placed the remainder of the cocaine in her pants because she did not "know exactly what [wa]s happening" and left the office with Mr. Stepanian still inside. *Id*. On her way out of the office, she saw Mr. Rosser enter the club. He looked at her,

---

[3] Ohio Rev. Code § 4301.25 empowers the Ohio Liquor Control Commission to suspend or revoke any liquor permit held by a convicted felon.

5

winked his eye, and asked her where "he" was. *Id.* She replied that Mr. Stepanian was in the office. *Id.*

Shortly thereafter, Mr. Rosser and Mr. Stepanian emerged from Mr. Jgenti's office with Mr. Stepanian in handcuffs. *Id.* at 182. At Mr. Rosser's direction, Officer Howard Robbins searched Mr. Stepanian's car. Mr. Stepanian was arrested for possession of cocaine.

After Mr. Stepanian had been arrested, Mr. Jgenti told Ms. Mills that Mr. Rosser wanted to know where the rest of the cocaine was. *Id.* at 188. Ms. Mills testified that Mr. Rosser said he "wished that [Ms. Mills] would have just left the bag of cocaine [in the office]" so that, Ms. Mills guessed, the police "had more to bust [Mr. Stepanian] on." *Id.* at 188.

Mike Goebel was at the club that night working security. *Id.* at 57. He saw Mr. Jgenti in the bathroom shortly before the police arrived. *Id.* When he left the bathroom Mr. Jgenti remained in a stall. *Id.* at 57 and 182. Mr. Goebel saw police officers pounding on the door to Mr. Jgenti's office. *Id.* at 58-59. Mr. Goebel did not understand how the police officers had gotten into the club because "standard procedure" required the outside door to be locked at closing. *Id.* at 61. Police officers on the scene did not interview anyone at the club. *Id.* at 62, 182.

Earlier in the evening, Ms. Mills had seen Mr. Lancaster driving by the Dollhouse. *Id.* at 181. Also, cell phone records placed Mr. Lancaster's cell phone at the Dollhouse from midnight on April 19 until about 5:30 a.m. the next morning, which was before and after Mr. Stepanian's arrest. (Ex. 306.) Those same records

6

show: (1) two calls and ten texts from Mr. Lancaster's work phone to Mr. Jgenti's phone; and (2) thirteen calls (three of which were shortly before Mr. Rosser entered the Dollhouse) and two texts from Mr. Rosser's personal cell phone to Mr. Lancaster's personal phone. All of those communications occurred late in the evening of April 19 and into the early morning hours of April 20. *Id.*

Mr. Rosser completed an arrest report about the incident. (Ex. 207.) Trial testimony largely conflicted with the report. For example, the report states Mr. Rosser went to the Dollhouse upon receiving a complaint about after-hours alcohol violations. But testimony revealed that Mr. Rosser had been waiting outside the club for some time before requesting backup for possible narcotics activity and that he made no mention of alcohol violations when seeking assistance from other officers. Additionally, the report said nothing about open containers but testimony revealed many were plainly visible in the bar and Mr. Rosser did not issue any liquor citations.

The report also stated that upon entering the club Mr. Rosser found Mr. Stepanian "bent over [the] top" of the desk in Mr. Jgenti's office with cocaine on the desk. Yet, Ms. Mills testified that she took the cocaine with her when she left the office and that Mr. Stepanian was trying to leave the office with her when Mr. Rosser arrived. And police on the scene testified that they struggled to find any cocaine in the office.

Mr. Rosser's report said Mr. Stepanian was the one to ask Ms. Mills do to cocaine with him. But she testified that Mr. Jgenti told her to do the drug with Mr.

7

Stepanian. And the report provided that Ms. Mills told Mr. Rosser she did not do cocaine, but she testified that she admitted to using cocaine that night to Mr. Rosser.

Another inconsistency was that the report said that Mr. Rosser interviewed all of the club's employees at the club that night, but several employees on duty said he did not interview anyone.

Mr. Stepanian and Ms. Nersesian settled their ownership dispute in May 2018, shortly after Mr. Stepanian's arrest. (Feb. 17, 2022 Tr. at 10.) That settlement resulted in Ms. Nersesian retaining ownership of the Dollhouse and Mr. Jgenti remaining as the club's manager.

No charges were filed against Mr. Stepanian.

### III. ANALYSIS

"'To obtain a conviction for conspiracy to violate civil rights under § 241, the government must prove that [the defendant] knowingly agreed with another person to injure [a third party] in the exercise of a right guaranteed under the Constitution." *United States v. Epley*, 52 F.3d 571, 576 (6th Cir. 1995) (citation omitted). Mr. Rosser argues the Government failed to sufficiently prove his knowing agreement with one or more persons to injure, oppress, threaten, or intimidate Mr. Stepanian from exercising his Fourth Amendment right to be free from unreasonable searches and seizures.

The Government's case against Mr. Rosser for Count II was predominantly circumstantial. "Circumstantial evidence alone, if substantial and competent, may

support a verdict and need not remove every reasonable hypothesis except that of guilt." *United States v. Tarwater*, 308 F.3d 494, 504 (6th Cir. 2002). As such, "a tacit understanding is enough to show a conspiratorial agreement." *United States v. Gresser*, 935 F.2d 96, 101 (6th Cir. 1991). "Furthermore, once a conspiracy has been established, only slight evidence is necessary to implicate a defendant." *Id.*

The Government presented substantial and competent evidence at trial that allowed the jury to find beyond a reasonable doubt that Mr. Rosser was guilty of violating 18 U.S.C. § 241. Specifically, the following testimony and evidence would have allowed the jury to find an agreement between Mr. Rosser and Mr. Jgenti to conspire to violate Mr. Stepanian's Fourth Amendment rights: (1) Mr. Jgenti did not want Mr. Stepanian to own or operate the Dollhouse; (2) Mr. Jgenti and Mr. Rosser were frequently seen socializing together at Mr. Jgenti's clubs; (3) Mr. Jgenti said he and Mr. Rosser planned to set Mr. Stepanian up for cocaine possession so that Mr. Stepanian would lose his ownership interest in the Dollhouse; and (4) evidence regarding the actual chain of events the night of April 19-20 was consistent with that plan but differed from Mr. Rosser's narrative in the report. Further, "knowledge of and participation in the common purpose and plan of a conspiracy may be inferred from the defendant's actions and reactions to the circumstances." *United States v. Gardner*, 488 F.3d 700, 711 (6th Cir. 2007) (citations omitted). In this regard, weighing the Government's knowledge and participation evidence in the light most favorable to the prosecution, the evidence revealed:

9

- Mr. Rosser requested backup for a drug bust before entering the club even though he said the initial tip was for violations of liquor laws.

- Mr. Rosser winked at Ms. Mills and asked her where Mr. Stepanian was immediately upon entering the club.

- Mr. Rosser ordered that Mr. Stepanian's car be searched.

- Mr. Rosser did not interview anyone at the scene.

- Mr. Rosser and Mr. Lancaster, as well as Mr. Lancaster and Mr. Jgenti, were in frequent telephone contact around the time of Mr. Stepanian's arrest.

- Mr. Lancaster was at the scene and his phone called Mr. Rosser shortly before Rosser entered the club.

- Mr. Rosser's report directly contradicted the testimony of several witnesses.

That substantial and competent evidence would have allowed a reasonable jury to find beyond a reasonable doubt that Mr. Rosser knowingly and directly participated in the agreement.

Mr. Rosser argues that the Government's failure to introduce direct evidence establishing his knowing agreement to, and involvement in, the conspiracy means the verdict must be overturned. (ECF No. 94, PageID 522.) His argument ignores the fact that circumstantial evidence is sufficient to find guilt where, as here, it is substantial and competent. *Tarwater*, 308 F.3d at 504.

Accordingly, viewing the evidence in the light most favorable to the Government while drawing all inferences in the Government's favor, the Court determines that the Government presented sufficient substantial and competent circumstantial evidence at trial to allow "*any* rational trier of fact to find the

10

essential elements of the [conspiracy] beyond a reasonable doubt." *Jackson*, 443 U.S. at 307 (emphasis in original).

## IV. CONCLUSION

Mr. Rosser does not sustain his very heavy burden, and his Rule 29 Motion is **DENIED**. (ECF No. 94.)

**IT IS SO ORDERED**.

> s/Sarah D. Morrison
> **SARAH D. MORRISON**
> **UNITED STATES DISTRICT JUDGE**